## CONSUMERS GAS TRUST COMPANY *v.* LITTLER.

[No. 20,246.   Filed March 15, 1904.]

GAS AND OIL LEASE. — *Construction.* — *Implied Condition.* — *Forfeiture.* — A gas and oil lease by the terms of which the lessee is to pay a stipulated annual rental of fifty cents an acre, until, in lessee's judgment, "oil or gas can not be found on the premises, or, having been found, has ceased to exist," clearly implies an engagement to explore for gas and oil and develop the premises within a reasonable time. *pp. 324–326.*

EVIDENCE. — *Judicial Notice.* — *Gas and Oil Lease.* — In construing a gas and oil lease the courts judicially know that gas and oil do not exist in paying quantities under all the lands within a recognized district, and there is no other generally acknowledged way than putting down a well to determine whether or not it does exist. *p. 326.*

Consumers Gas Trust Co. *v.* Littler.

GAS AND OIL LEASE.—*Forfeiture.*—*Notice.*— *Waiver.*— Where, under the terms of a gas and oil lease, the owner of the land had the option to require the lessee to drill within a reasonable time, under penalty of forfeiting the lease, or to accept a certain sum annually for delay, an acceptance of an annual payment in advance was a waiver of performance for the year; and where such annual payments had been accepted continuously for five years, the landowner could not by refusal to accept payment for the sixth year claim a forfeiture for failure to drill within fifteen days.  *p. 328.*

From Grant Circuit Court; *H. J. Paulus*, Judge.

Suit by Joseph W. Littler against the Consumers Gas Trust Company. From a judgment for plaintiff, defendant appeals. Transferred from Appellate Court, under §1337u Burns 1901.  *Reversed.*

*W. H. H. Miller, J. B. Elam, J. W. Fesler* and *S. D Miller*, for appellant.

*Hiram Brownlee, J. F. Charles* and *J. R. Browne*, for appellee.

HADLEY, J.—Appellee sued appellant to secure the cancellation and the quieting of his title against a gas and oil contract, the substance of which follows:  It was entered into on October 15, 1896, by appellee and his wife, as first party, and one Walley, assignor of appellant, as second party, hereinafter referred to as "gas company," and witnessed that the first party, their heirs and assigns, in consideration of $1 in hand paid, sold to the second party, his heirs and assigns, all the oil and gas under certain described lands in Grant county, "together with the right to enter upon said lands at all times for the purpose of drilling and operating for oil, gas, or water, with the right to erect and maintain all necessary telephone lines, buildings, and structures for that purpose; and together with the right to lay, maintain, and remove all lines of pipe over and across said lands for the conveyance and transportation of oil and gas. In consideration of the premises, the second party agrees to pay the first party

the sum of $40 annually, beginning on the 15th day of October, 1896 [date of the contract], and until oil or gas is found in paying quantities, or this grant is terminated as hereinafter provided." The second party is not to drill any well within 300 feet of any building on the premises, and is not to use more than one acre of the ground with each well drilled. The first party is to have the use of the lands for agricultural or other purposes, except what is actually occupied in operating for gas or oil. The second party is to pay the first party all damages done to crops by reason of its operations in drilling wells or in laying, repairing, or removing pipe-lines. If oil is found in paying quantities, the second party is to deliver to the credit of the first party in the pipe-line with which it may be connected one-sixth part of the oil which may be saved. The first party is to have free gas for domestic purposes from the wells or pipe-line on the premises, and should gas be found in greater quantity than is required for use by the first party, the second party is to pay the first party "$100 each year for each and every well from which gas is used off the premises." If either gas or oil is found on the premises in paying quantities, "the part of oil to be delivered as aforesaid, or the sum per well for gas, shall be in lieu of the annual payment above provided," and such annual payment shall cease immediately. "It is agreed by the parties, that whenever, in the judgment of the second party, his heirs or assigns, oil or gas, or either, can not be found on the premises, or, having been found, have ceased to exist in paying quantities, and said party of the second part shall reconvey to the first party, their heirs or assigns, all the oil and gas in and under said premises, then all payments of every kind to be made to the first party by the terms hereof shall from and after said date cease and determine," and in case of a reconveyance the second party is to have the right to lay and main-

tain pipe-lines for the transportation of oil and gas over the premises for ten years from "said date," and the right at any time to remove all machinery, fixtures, and property placed on the land. All payments under the contract to be made on October 15 of each year at a bank in Muncie. "In default of complete compliance on part of second party, or his assigns, renders this lease null and void." Signed by all contracting parties, and execution acknowledged before a notary public on said October 15, 1896.

The deal embraces a quarter section of land. There was a separate contract for each eighty on same terms. The complaint is in three paragraphs. The first, being a general statutory count to quiet title, covers the whole farm. The second and third were addressed to the respective eighties, and each set out the contract in full. In addition to formal matters, the second and third paragraphs of complaint each allege the recording of the contract, the assignment thereof by Walley to the defendant, and recording of such assignment, the payment by defendant on or about October 15, 1900, of $40 as a consideration for the defendant's option and right to drill on the premises for one year from the last-named date to October 15, 1901, which payment was the exact amount due the plaintiff under the contract at the time it was paid, and nothing has since been paid thereon to continue the contract after that date; that on October 15, 1901, plaintiff refused, and still refuses, longer to continue the contract in force, or receive any further payments therefor, but declared the contract then terminated and forfeited; that neither defendant nor its assignor has ever drilled a well on said premises, nor has gas or oil ever been found thereon, nor has anyone under the contract laid a pipe-line thereon for oil or gas; that plaintiff is, and at all times has been, in possession, and neither Walley nor defendant has ever been in possession; that defendant claims rights under the

contract.   Prayer for cancelation and quieting title, etc. The defendant's demurrer to the second and third paragraphs was overruled.

In its answer to the second and third paragraphs it alleged, in substance, that the second party in the contract, Walley, was the agent of the defendant, took the contract for it, and afterwards made a formal assignment of the same to the defendant.   It alleges the payment of the annual sum stipulated—$40—on or before the 15th day of October in each year, down to the 15th day of October, 1901, and an offer to pay for the year commencing on that date, and the refusal of the same by the first party upon the ground that first party had a right to terminate the contract and intended to do so at that time; and that second party had been at all times ready to pay the same. It denied that the contract had ever been terminated as provided therein, and denied that the $40 annually was paid as a consideration for the option or right to drill for any one year, but avers that it was a part of the consideration for all the rights and property granted under the contract.   It denied that it had ever been ascertained that, in the judgment of said Walley or defendant, oil or gas, or either, could not be found on the premises, or that, having been found, the same has ceased to exist, and denied any reconveyance.   Plaintiff's demurrer to each paragraph of the answer was sustained.   Thereupon, defendant declining to answer further, judgment was rendered on demurrer against it annulling the lease and quieting plaintiff's title as against the same.

The only matter for decision is the sufficiency of the complaint and answers.   They present the same questions, and will be considered together.   It will be observed that the contract before us, like many others of its class, embraces indefinite and peculiar provisions.   By it appellee purports to "sell" to appellant's assignor, for the consideration of $1, all the gas and oil underlying his land,

and the right to enter at any time to mine and transport it. No time is fixed for the beginning of operations, nor for the completion of a well, nor any express provision that appellant shall ever drill a well. It is, however, stipulated that, as a further consideration, the company shall pay to appellee $40 each year on each eighty, in advance on each October 15, beginning on the day the contract was executed, until oil or gas is found in paying quantities, or until, in the judgment of the gas company, or its assigns, oil or gas can not be found on the premises, or, having been found, shall cease to exist in paying quantities. And whenever a well is drilled if oil is found the landowner shall have one-sixth part, and, if gas, he shall have $100 each year for each well, and that the one-sixth of the oil, or $100 per well, shall be in lieu of the annual acreage rental, which shall no longer be paid.

There is nothing in the subject-matter of the contract to limit the power of the parties to enter into such mutual obligations as they liked. No fraud or overreaching is claimed, and it becomes our plain duty to give the instrument the effect intended by the parties at the time it was executed. "If there is one thing which more than another public policy requires," said an eminent English jurist, "it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts when entered into freely and voluntarily shall be held sacred and shall be enforced by courts of justice." *Printing, etc., Co.* v. *Sampson,* 19 L. R. Eq. 462.

What, then, was the contract? It is clear that the fundamental purpose of both parties was the exploration for gas and oil on the premises. The whole tenor of the contract shows that the prospective benefits and profits from gas or oil were the real considerations moving the contracting parties. To the landowner the manifest inducement was the rent and royalties he expected to enjoy if the gas company should find gas or oil in paying quantities;

to the gas company, the right to exclude others from the premises, and the anticipated profits in vending the products of the wells it should drill.  It will not do to believe that the landowner would for the pittance of fifty cents per acre per annum have knowingly encumbered his land situate in the gas district, and thereby reduced its selling value, by transferring, for an indefinite period, and for speculative purposes, the right to enter at the pleasure of the grantee or his assignee and mine the underlying gas or oil; or that he would have bargained away his prospects for large gains from the gas and oil under his land, with the knowledge that the same would be extracted through wells on other premises, and that his profits would be limited to the annual acreage rent during the process of extraction.

It is as obvious as if expressed that the real intention of the parties was that the gas company or its assigns should, with diligence, and within a reasonable time, enter upon the premises and drill a well, and thereby test the existence or nonexistence and continuance of the fluids in paying quantity.  We judicially know, as a matter of common knowledge, that gas or oil does not exist in paying quantities under all the lands within the recognized district, and that there is no other generally acknowledged way than putting down a well to determine whether or not it does exist.  The company's undertaking to pay the landowner until, in the judgment of the company, "oil or gas can not be found on the premises, or, having been found, has ceased to exist," clearly implies an engagement to explore and develop the premises.  The stipulation does not contemplate an arbitrary judgment, but an honest one; a judgment that is justifiable by the results of a *bona fide* investigation; such as could only be arrived at by sending down the drill to where the oil or gas is or should be. *Louisville, etc., R. Co.* v. *Donnegan,* 111 Ind. 179, 188;

*Crane Elevator Co.* v. *Clark,* 80 Fed. 705, 26 C. C. A. 100.

The obligation to explore is such an essential part of the contract, though implied, as must be treated as a condition which, if not performed within a reasonable time, entitled appellee to claim a forfeiture under the agreement that, "in default of complete compliance on the part of the second party, or his assigns, renders this lease null and void." *Gadbury* v. *Ohio, etc., Gas Co., ante,* 9. But while appellant's default under the contract might be of a character to bestow upon appellee the right to demand a forfeiture, yet that right may be defeated by conduct amounting to a waiver. Equity looks with disfavor upon forfeitures, and when such is claimed it will closely scrutinize the demand, and will interpose to prevent it when its enforcement will operate inequitably or unconscionably. *Thompson* v. *Christie,* 138 Pa. St. 240, 20 Atl. 934, 11 L. R. A. 236; *McCarty* v. *Mellen,* 5 Pa. Dist. Rep. 425. "If there has been a breach of an agreement," says a distinguished author, "sufficient to cause a forfeiture, and the party entitled thereto, either expressly or by his conduct, waives it or acquiesces in it, he will be precluded from enforcing the forfeiture." Pomeroy, Eq. Jurisp. (2d ed.), §451; *Lynch* v. *Versailles Fuel Gas Co.,* 165 Pa. St. 518, 30 Atl. 984; *Hukill* v. *Myers,* 36 W. Va. 639, 15 S. E. 151. In this, as in other mutual agreements, the engagements are equally binding on the contracting parties. They must be equally fair and just in performance, and one will not be permitted to cause the other to suffer from an act which he himself induced. The contract imports a sale to appellant's assignor of all the gas and oil underlying appellee's farm, to be paid for in kind and by well rental after wells are put down. No time is indicated when a well shall be constructed or when exploring operations shall begin, but it is expressly stipu-

lated that until such well is put down, the company shall pay appellee on each eighty $40 per annum, in advance, beginning on the day the contract was made.

When the contract was entered into it was problematical whether either gas or oil was to be found under appellee's land. He then, under the contract, had his election whether he would require, by claiming a forfeiture, the existence or nonexistence of gas or oil under his premises to be determined within a reasonable time by drilling a well, or whether he would prefer delay and the $80 per annum, rather than take his chance on the finding of gas or oil, and the possible total loss of any further revenue from the prospect. If he chose the former, under the vague and uncertain terms of the contract, equity required him to give appellant reasonable notice of his intention, or, what would be equivalent to such notice, refuse to assent to or accept a consideration for a postponement beyond a reasonable time. *Hukill* v. *Myers, supra; Thropp* v. *Field,* 26 N. J. Eq. 82; *Double* v. *Union Heat, etc., Co.,* 172 Pa. St. 388, 33 Atl. 694. If he chose the latter—as he did—the acceptance of the $40 at the time of the contract was a waiver upon a valid consideration of performance for one year. The acceptance of a like sum at the beginning of the second year was a like waiver for the second year, and likewise to the end of the five years for which such payments were made. So at the end of the latter period, to wit, October 15, 1901, the relations of the parties stood, with respect to appellee's right of forfeiture, precisely as they were at the moment the contract was executed. Up to October 15, 1901, appellee had no ground of complaint. He had consented to the delay, and had received a satisfactory consideration for it. Therefore this suit, commenced fifteen days later, can not be sustained. He could not go on, as the pleadings show, through a term of years, without complaint or appearance of dissatisfaction, and by his conduct lull appellant into a sense of secur-

ity and state of unpreparedness, and successfully claim a forfeiture without such reasonable notice as would afford appellant a fair chance to discharge his obligation. The refusal of appellee on October 15, 1901, to accept the annual payment for another year was notice that further delay in commencing operations was not approved, but we can not say as a matter of law that it was sufficient notice under the circumstances. Appellant might not have possessed any drilling machinery, and there might have been none obtainable within the brief period of fifteen days. Besides, we know as a matter of common knowledge that it is often impossible to complete a well in fifteen days.

Judgment reversed, with instructions to sustain the demurrer to the second and third paragraphs of the complaint.