### KEECHI OIL & GAS CO. et al. v. SMITH et al.

No. 10698—Opinion Filed May 10, 1921.

(Syllabus.)

**1. Appeal and Error — Review — Equity Cases.**

In an equitable action this court will weigh the evidence, and, if the judgment of the trial court is clearly against the weight thereof, will render, or cause to be rendered, such judgment as said court should have rendered.

**2. Oil and Gas — Construction of Lease—"Oil and Gas in Paying Quantities."**

The phrase, "oil or gas is found in paying quantities," means in sufficient quantities to pay a reasonable profit on the necessary sum required to be expended, including the cost of drilling, equipment, and operation of well.

**3. Same—Compliance by Drilling—Action to Forfeit.**

It is error to declare an oil and gas lease forfeited which contained the following provision, to wit: "That second party agrees to commence operations of drilling within 90 days from the date hereof somewhere within the vicinity of Cement and drill to a depth of 3,000 feet unless oil or gas is found in paying quantities at a lesser depth, and continue drilling with due diligence to completion," when the evidence disclosed the lessee commenced the vicinity well and had continued to drill with due diligence to the date of filing suit to cancel the lease, although the partes had not found oil and gas in paying quantities nor completed said well to a depth of 3,000 feet. The continued drilling with due diligence was a compliance with the express covenant contained in the lease.

**4. Appeal and Error — Findings — Insufficiency of Evidence — Cancellation of Oil Lease.**

On an appeal from the judgment of the trial court canceling an oil and gas lease for violation of certain express covenants contained in the lease, where the court made a general finding in favor of the lessor canceling said lease, and from an examination of the entire record the evidence is insufficient to support a finding that the lessees have failed to comply with any of the express covenants in the lease, the judgment of the court will be set aside as clearly against the weight of the evidence.

Elting, J., dissenting in part.

Error from District Court, Caddo County; Will Linn, Judge.

Action by J. D. Smith and another intervening in suit begun by I. M. Duncan and another as plaintiffs against the Keechi Oil & Gas Company and others to cancel oil lease. Judgment for interveners, and defendants bring error. Reversed and remanded.

Bond, Melton & Melton, for plaintiffs in error.

Morris & Jameson, for defendants in error.

McNEILL, J. This action was commenced in the district court of Caddo county by I. M. Duncan and another against the Keechi Oil & Gas Company and others. J. D. Smith and Dora A Smith intervened asking cancellation of a certain oil and gas lease executed by J. D. Smith and Dora A. Smith to I. M. Duncan, which lease is now owned by the defendants. The Smiths having assumed the affirmative of the issues, for convenience they will herein be referred to as plaintiffs. The amended petition, for grounds for cancellation, alleged the land was the homestead of the Smiths and the lease was executed on the 19th day of January, 1916, by J. D. Smith without any consideration, and that about the 15th day of December, 1916, Dora A. Smith executed said lease without any consideration whatever, except the lessee agreed to immediately resume drilling on what is known as the Kunzmiller well, and to continue actual drilling to a depth of 3,000 feet, unless oil and gas were found in paying quantities; that said representations were false and untrue, and made with the fraudulent intent to deceive Mrs. Smith and with no intent to continue drilling, and made to obtain Mrs. Smith's signature to said lease, and she relied upon the said representations, and that said lease was obtained by fraud and void.

The second ground for cancellation alleged that the lease contained the following provision:

"Second party agrees to commence operations of drilling within ninety days of date hereof somewhere within the vicinity of Cement, Oklahoma, and to drill to a depth of three thousand feet unless oil and gas are found in paying quantities at a lesser

depth and continue drilling until said well is completed."

It is contended that the defendants breached this provision of the lease and had forfeited their rights in said lease.

The third ground for cancellation was that the lease provided that if no well was completed on the premises within one year from the date thereof, the lessee agreed to pay at the rate of $1 per acre, payable in advance, until a well was completed. It is alleged that no well was completed and no money paid according to the terms of the lease.

The fourth contention was that the lease was unilateral and void.

The defendants answered, and upon trial of the case the court found the issues in favor of the plaintiffs and against the defendants and canceled said lease.

From said judgment the defendants appealed. The grounds alleged for cancellation of the lease depend upon questions of fact, and the court having made a general finding in favor of the plaintiffs, in order to reverse the judgment it wil be necessary to find that the finding of the court is clearly against the weight of the evidence on each proposition.

The first allegation of the petition was that there was no consideration for said lease. The lease recites one dollar consideration and the further consideration that the well should be drilled within the vicinity of Cement to the depth of 3,000 feet unless oil or gas was found in paying quantities at a lesser depth. Mr. Smith, one of the plaintiffs, testified that he did not receive the dollar, nor did he contend that the lease should be canceled for that reason, but that the consideration for the lease was the drilling of a test well in the vicinity of Cement and the lease should be canceled for failure to comply with that provision in the lease.

We think this is the material question in the case, and the judgment of the trial court depends upon whether the lessee had failed to comply with this express covenant in the lease at the time of the institution of the suit. The first requirement under this express covenant of the lease was the commencement of operations of drilling within 90 days from the 19th day of January, 1916. Whether there was a strict compliance with this 90-day provision, we think is immaterial, for the lease in this case was not executed by Mrs. Smith until the 15th day of December, 1916, and the lease was of no force and effect until that day, the land being the home-

stead of Mr. and Mrs. Smith, and the lessee or his assignees had drilled a well within the vicinity of Cement to a depth of about 1,500 feet at the time of signing the lease. This would be a waiver of the right to forfeiture for failure to strictly comply with this provision to commence operations of drilling within 90 days.

The second requirement was to drill to a depth of 3,000 feet, unless oil or gas was found at a lesser depth in paying quantities. The term "paying quantities" in an oil and gas lease has been defined by this court to mean:

"The phrase 'oil or gas is found in paying quantities,' means in sufficient quantities to pay a reasonable profit on the necessary sum required to be expended, including the cost of drilling, equipment, and operation of well." Ardizonne v. Archer, 72 Oklahoma, 178 Pac. 263; Pelham Petroleum Co. v. North, 78 Okla. 39, 188 Pac. 1069.

The evidence disclosed that oil was not found in paying quantities as measured by the above decisions, although it was believed by all of the people familiar with the well from the First of December, 1916, until long after the commencement of this suit that the Kunzmiller well was a paying well, but it later developed not to be a paying well. The next requirement was that a well was to be drilled to a depth of 3,000 feet. It is admitted that no well was drilled to a depth of 3,000 feet. The lease does not provide when said well shall be completed to a depth of 3,000 feet, but provides the lessee shall continue work with due diligence. The evidence is conclusive that the parties worked with due diligence, taking into consideration that this was a "wild cat field," and in December, 1916, found oil and gas. They then worked diligently in their attempt to make the well produce oil and gas in paying quantities. They worked at the well for some eight or nine months trying to produce oil and gas in paying quantities. There is no contention that this work was not done in good faith.

This action was commenced on the 14th day of March, 1917, and if the plaintiffs are entitled to have said lease canceled, it is by virtue of the violation of some express provision of the lease that existed on or prior to said date. No supplemental petition was filed asking for cancellation of the instrument for failure to comply with any of the express covenants of the lease that accrued after the filing of the petition. On the 14th day of March, the date of instituting this suit, the lessee had not found oil and

gas in paying quantities in the vicinity well, nor had they drilled to a depth of more than 3,000 feet, but they had commenced the work, and since the execution of this lease had worked continuously, diligently, and in good faith and complying with this provision of the lease. The evidence is conclusive that there was no violation of this express covenant in the lease at the time of the commencement of this action.

We will now consider the other grounds for cancellation of the lease as alleged in the petition. In regard to the allegation that at the time Mrs. Smith executed the lease certain false and fraudulent representations were made to her in regard to continuing drilling on the Kunzmiller well, it is sufficient to say that no evidence was introduced to support this allegation of the petition.

The third allegation for cancellation of the lease was that the lessee had not paid the dollar per acre for the second year's rental. This rental became due on January 19, 1917, and the evidence is conclusive that the lessee had tendered the plaintiff said amount, which was refused and on said date the rental was deposited in the bank designated in the lease as the depository, so there was a strict compliance with this provision of the lease.

The next contention is that the lease was unilateral and void by reason of the surrender clause. There is no merit in this contention. This question has been definitely settled by this court in the case of Rich v. Doneghey, 71 Oklahoma, 177 Pac. 86.

These are the only grounds on which the plaintiffs sought to have said lease canceled, and the evidence is insufficient to support a finding of the court that the lessee has violated any of the covenants contained in the lease, and the finding of the court in favor of the plaintiffs is clearly against the weight of the evidence.

The defendants in error have filed a motion to dismiss for the reason said lease, by its own terms, terminated on January 19, 1921, and the questions herein are now moot. The plaintiffs in error have filed a response resisting said motion, contending they have certain rights and equities, and further contend they would have a right to have the lease extended by reason of this litigation if it was wrongful. The rights of the parties under the lease are to be determined as of the date upon which this action was brought in the district court. What has happened since that time, we are not advised, nor can these questions be litigated here on a motion to dismiss. If the case should be affirmed

the rentals deposited in the bank before the commencement of the suit would belong to plaintiffs in error; if reversed, to defendants in error; so the question is not moot, if for no other reason than to determine the rights of the parties to the rentals already deposited by plaintiffs in error to the credit of defendants in error.

The judgment of the trial court is therefore reversed and cause remanded, with directions to dismiss plaintiffs' petition.

HARRISON, C. J., and PITCHFORD, JOHNSON, and NICHOLSON, JJ., concur.

---

ELTING, J. (concurring in part). I concur in the general conclusion that there was no forfeiture of the lease, and that cause should be reversed and remanded, with directions to dismiss the interveners' petition, but do not concur in all the conclusions stated in the opinion. I cannot concur in the conclusion that the Kunzmiller well was not a paying well and that, under the circumstances of its being a developing well, and that the lessors had only an indirect interest in the production and that the main purpose was development and not production and being in a wildcat field, and no market for oil, and there being no specific provision for forfeiture, the law, under such circumstances, will not raise one by implication. See Poe v. Ulrey (Ill.) 84 N. E. 46, for statement of the rule that is applicable.

The surrender clause should be held void because no consideration is named to be paid for the surrender.. In addition to the reasons given in Rich v. Doneghey, cited in the opinion, the voidness of a surrender clause, which fails to name the amount to be paid, is held in the case of Riddle v. Keechi Oil & Gas Co., 74 Oklahoma, 176 Pac. 737. The validity of a contract cannot be attacked for failure to pay a consideration the receipt of which is acknowledged in a written contract. See Poe v. Ulrey, heretofore cited; Finlayson v. Finlayson (Ore.) 21 Pac. 59; Stannard v. Aurora, etc., Ry. Co. (Ill.) 77 N. E. 256. The other reasons for dissent are expressed in the lengthy dissenting opinion.

ELTING, J. (dissenting). The writer of this dissenting opinion is not dissenting from the final conclusion of the opinion reversing the case and denying the forfeitures prayed for by the interveners below, defendants in error herein, and the manner of his concurrence is stated in the concurrence at the close of the case.

The writer concurs in the opinion overruling the motion to dismiss the appeal, but dissents for the reason that the opinion does not go far enough, in that it fails to find specifically that an equity has arisen in favor of the lessees, plaintiffs in error herein, by reason of the wrongful litigation. I think this court should hold that the lessees are entitled to a reasonable time, on and after the final determination of the litigation herein, in which to test for oil upon the premises leased, and that it is the duty of this court, under its undoubted equity powers, to either definitely decree the time and fix the terms of forfeiture when this lease shall end in the event the lessees fail to perform as directed by the decree of this court, or else this court should remand this case with directions to the trial court to fix the time of extension and to definitely determine the rights of the parties to said contract as to future forfeitures. This dissenting opinion is not what it ought to be, and we feel, at the outset, that it will fall far short in learning and in the application of old rules to new conditions or the application of any new rules that it may attempt to apply to the situation now existing between the parties to this contract. The writer, however, is sincere in the application of the general principle of equity that is sought to be applied herein, but admits some misgivings as to the application of some of the principles which may be enunciated herein, and that it is only by invoking the power of equity and by an appeal to conscience and right that the rule of strict forfeiture can be prevented from being applied to the ending of this contract and, as we view it, an injustice be prevented. The effort of the writer herein will be to show that there is nothing more in the fixing of a term, in this kind of a contract, than any other forfeiture feature either specifically provided in the contract, or which may arise by implication of law; that it can be waived during the term of the lease, or that the lessor may, by his conduct, and by his inequitable actions, and by a breach of his implied warranty to the lessees of peaceable and quiet enjoyment of their contractual rights, which the opinion of the majority of this court upon the merits of this appeal has had the effect of preserving to them, provided some hard and rigid rule of law does not prevent them becoming effective. It has been suggested that, if this court undertook and did fix a definite arrangement, as to the extension of this lease beyond its term it would in effect be making a new contract for these parties. The writer is unable to see in what respect this court would there-

by be doing anything but what courts of equity are doing every day, and that is, relieving parties to contracts from the strict terms thereof by reason of rights that have arisen from the circumstances, conduct, and relation of the parties during the term of the contract. If this is such a contract that a court of equity will, during its term, specifically enforce at the behest of the lessees or either party thereto, why has not a court of equity the power to enforce the remedy beyond the term in a proper case and such as the writer contends this to be?

It is not the making of a new contract, but is decreeing that such and such a thing shall now be done, which the contract said should have been done sooner, but the performance was prevented by the fault of one who now says it cannot be done. Equity says it can be done; that it has the power to so decree that it can be done, although out of time. The subject-matter still exists and has not become non-existent, such as the lapsing of a patent right or a license to do business; that is, the subject-matter of a contract which can only be renewed or extended by a power that a court of equity cannot control. The relations of the parties it is practicable for a court of equity to control by decreeing that something should now be done, though out of time, which, according to the contract, should have been done sooner.

The abstractions and distinctions between conditions precedent and conditions subsequent, and as to whether the production of oil in paying quantities before the end of the term is either one or the other, are not of much practical effect as the writer views it. In one sense it might be held to be a precedent condition when we consider the full investure of the rights of the lessees, but when we consider it in the light of the fact that the contract gave to the lessees certain contractual rights, specific and implied, such as is the right to enter upon the premises during the term of the lease and test for oil and being such rights as a court of equity will specifically enforce, the production of oil, as to such rights, is a condition subsequent, and a failure to perform forfeits such precedent rights, unless saved by any equities held sufficient to relieve against forfeiture. The writer is not going to say that the equity maxim, "that courts of equity do not favor forfeitures based on breach of conditions subsequent," applies to a forfeiture arising under an oil lease like the one in the instant case. We think the trend of modern equity in passing upon such condition

in an oil lease is to hold a forfeiture, unless the granting of a forfeiture would be against justice and good conscience. In other words, if equity has any leaning, either one way or the other, it is in favor of the forfeiture, and in the opinion of the writer, this is rightly so, and is more in consonance with the better policy of the law.

The following is a portion of section 379, Pomeroy on Contracts (2d Ed.) "Specific Performance," found on page 464:

"The fundamental principle upon which the answer to the question turns, is the following: Where a contract depends upon a condition precedent; or, in other words, where the intention of the parties is that no right shall vest until certain prescribed acts are done or omitted or unless certain prescribed acts are done or omitted, at or before a specified time, then equity will not relieve against a breach of such precedent condition, for no court has the power to make a new contract for the parties which shall confer rights where no rights at all originally existed. But if a contract contains a condition subsequent; or in other words if the intention of the parties is that the rights under the agreement shall vest at once upon its conclusion—subject, however, to be defeated or ended upon the non-performance of the provision which constitutes the subsequent condition, or its non-performance at or before a specified day—then equity, by virtue of its general jurisdiction over penalties and forfeitures, has power to relieve the defaulting party from the loss of forfeiture caused by his breach of the subsequent condition. This power of relief would even more certainly exist when the breach was a failure, not to do the thing at all, but merely to do it at or within the time stipulated by the contract. It is, therefore, held, in a great number of cases, that the forfeiture provided for by such a clause as the one described above, on the failure of the party to fulfill at the proper time, unless such failure is intentional, or causes an injury to the other party which cannot be compensated, will be disregarded and set aside in equity; and the defaulting party performing or being ready and willing to perform, at a subsequent time, will be allowed to enforce the contract notwithstanding his delay. In short, the general doctrine is applied in the face of such an express provision declaring the contract ended in case of a non-fulfillment of its terms at the appointed day, unless the agreement is so worded that a compliance with these terms at the prescribed time is made a condition precedent to the vesting of any rights."

On January 23, 1920, the plaintiffs in error filed in this court a motion to have this case advanced, which, omitting the caption, was in words and figures as follows:

"Plaintiffs in error, Keechi Oil & Gas Company, Oklahoma Star Oil Company, O. W. Goolsby, J. M. Bailey, and Walter Jones, move the court to advance this case on the docket for hearing and determination for the following reasons:

"(1) March 14, 1917, defendants in error, J. D. Smith and Dora A. Smith, filed their petition in the district court of Caddo county, Oklahoma, against plaintiffs in error seeking to cancel an oil and gas lease on the north half of the southwest quarter of section 30, township 6 north, range 9 west, in Caddo county, Oklahoma, which oil and gas lease is dated the 19th day of January, 1916, and provides that same shall be for a term of five (5) years from such date and as much longer thereafter as oil or gas is found in paying quantities on the land (Record 6).

"On the 10th day of February, 1919, the district court of Caddo county, Oklahoma, rendered a judgment for the defendants in error and against the plaintiffs in error canceling such oil and gas lease and from such judgment plaintiffs in error appealed to this court."

"(2) Plaintiffs in error say that under and pursuant to the terms of the said lease in controversy it is contended by the defendants in error that the same will expire on the 19th day of January, 1921, unless oil or gas is found on the land described therein in paying quantities prior to such date. That said oil and gas lease is valuable and that the plaintiffs in error cannot drill a well thereon in order to determine whether or not the land described therein will produce oil and gas in paying quantities and cannot induce others to drill a well thereon while such lease is in litigation and while this action is pending and undetermined, and therefore plaintiffs in error say that unless said court advances said cause for hearing and determination, the plaintiffs in error may lose a valuable right and property by reason of the expiration of time within which the land described in the said lease may be prospected for oil and gas.

"Wherefore, plaintiffs in error move the court to advance this cause.

"Bond, Melton & Melton,

"Attorneys for Plaintiffs in Error."

Shortly after the filing of said motion to advance, this court did advance said cause.

On January 22, 1921, the defendants in error filed herein a motion to dismiss this appeal, which was in words and figures as follows, omitting the caption:

"The defendants in error move the court to dismiss the petition in error herein for the following reasons, to wit: The oil and gas lease involved herein, and appearing on pages 6 and 7 of the record, by its own terms, expired on January 19, 1921, and there is,

therefore, no controversy between the parties to be determined.

"Morris & Jamison,

"Attorneys for Defendants in Error"

On February 9, 1921, plaintiffs in error filed a response to said motion to dismiss, in which they denied that the question involved herein had become moot by reason of the expiration of the term of the lease involved in this suit; setting up their right to have this appeal passed upon by this court, and in the event that the appeal is sustained, then the equity powers of this court are invoked to grant an extension of the term of said lease for the length of time this matter has been in litigation; attaching thereto their arguments and authorities in support of their contention. On February 21, 1921, the defendants in error filed a reply to said response, setting up their arguments and authorities controverting the contentions of the plaintiffs in error in their response to the motion to dismiss. Thus a new issue is raised in this court, and this court, having full equity powers, should not and, as we view it, cannot rightly shun the responsibility of fully and completely reviewing the rights and equities of the parties, as is hereby raised by this motion of dismissal.

The following law defines the power and scope of this court—since we are acting as a court of equity (quoting from 16 Cyc. pages 106-110):

"A court of equity which has obtained jurisdiction of a controversy on any ground or for any purpose will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the subject-matter. This doctrine seems to rest on the same principles which permit a court of equity to take jurisdiction in the first instance, because the remedy is incomplete, or to avoid multiplicity of suits.

"By virtue of the rule the court, when its jurisdiction has been invoked for any equitable purpose, will proceed to determine any other equities existing between the parties, connected with the main subject of the suit, and grant all relief requisite to an entire adjustment of such subject, provided it be authorized by the pleadings. Relief of an equitable character may thus be incidentally obtained, when an original bill would not lie for such relief alone.

"When plaintiff has established a right to equitable relief the court will not only grant that relief but all other relief essential to a complete adjustment of the subject-matter among the parties, although it is thereby required to grant relief obtainable at law, and which if the object of an independent action could be obtained at law alone. Notwithstanding the refusal of equity

generally to decree the delivery of the possession of land, such delivery will often be decreed for the purpose of affording complete relief, when a resort to equity has been necessary in order to establish plaintiff's title or right of possession. The same rule prevails with regard to chattels. Under a variety of circumstances the court for the same reason and as incidental to equitable relief may order the payment of money, although a separate action at law would lie therefor. Thus the jurisdiction of equity having been invoked to restrain the further commission of wrongful acts, damages already suffered will quite generally be awarded."

Of like effect are Michigan Pipe Co. v. Fremont, etc., Co., 111 Fed. 284, 49 C. C. A. 324; Deweese v. Rienhard, 165 U. S. 386, 17 Sup. Ct. 340, 41 L. Ed. 757; Eaton on Equity, page 74; Pomeroy, Equity Jurisprudence, sec. 398; Angle v. Chicago, etc., Ry. Co., 151 U. S. 23, 14 Sup. Ct. 240, 38 L. Ed. 55; Depuy v. Selby, 66 Oklahoma, 76 Pac. 307; Cook v. Warner, 41 Okla. 781, 140 Pac. 424.

To facilitate the determination as to whether or not the expiration of the term of the oil lease involved in the instant suit has had the effect of mooting the question involved herein, and as to whether the determination of the issues involved in the appeal can now constitute a decision on the substantial rights of the parties, we desire to state a few facts that are determined by this record and by the majority opinion of this court.

The lease in this case is one that has not been attacked for fraud, mistake, overreaching, or other things that would in any manner impair it as a fair and honorable expression of the intention of the parties. We have held it amply supported by a legal consideration, and that its terms have been complied with in a legal and substantial way.

On March 14, 1917, a little over a year after the execution of said lease by one of the defendants in error and less than one-half a year after the execution by the other defendant in error, the defendants in error filed a suit in the district court of Caddo county, Oklahoma, asking for a cancellation of said lease upon several grounds of forfeiture alleged therein and to clear cloud from the title to the land.

The holding of this court is such as to declare the allegations of the petition for the forfeiture of said lease to be without merit, and holding in effect that said suit was wrongfuly brought, and we have held the decision of the lower court not correct, and the

same is reversed and remanded, with directions to enter judgment for appellants.

The habendum clause of this lease reads in part as follows:

"To have and to hold the same unto the said parties of the second part, his heirs, successors, and assigns, for the term of five years from the date hereof and as much longer as oil or gas is found in paying quantities, excepting and reserving to first party the one-eighth part of all the oil produced and saved from the said premises, to be delivered into the pipe lines to the credit of the first party free of cost and should any well produce gas in sufficient quantity to justify marketing the same, second party shall pay therefor at the rate of $200.00 per annum payable within 30 days from the time said gas is used therefrom and yearly thereafter for such a time as gas therefrom is marketed"

—and then further provides for the mutual promises as to the use of the premises and of oil, gas, and water on said premises.

The second clause of the lease demises and grants all oil and gas in and under the described tract of land, also grants the right of use of the surface of the land for the purpose of developing the oil and gas, and providing for the removal of the property of the second party and waiving claim to any of the property placed thereon by the second party.

A portion of the fifth clause of said lease provides as follows:

"Second party agrees to complete a well on the above described tract of land within one year from this date or thereafter pay first party a rental of one dollar per acre per year per annum, payable annually in advance until such well is completed."

We are copying these provisions of the lease herein to show their connection and relation, and that they may be interpreted in the solution of this moot question. We hold that the effect of this lease is to grant to the lessee, if not a free-hold interest in this land, at least not a tenancy at will, but a tenancy for a term of years. It has been held to be such an interest in the cases of Rich v. Doneghey, 71 Oklahoma, 177 Pac. 86, and Brewster v. Lanyon Zinc Co., 140 Fed. Rep. 807, a decision by Van Devanter, Circuit Judge. See, also. the case of Bruner v. Hicks, 230 Ill. 536, 81 N. E. 888, 120 Am. St. Rep. 332; Poe v. Ulrey, heretofore cited; Gillispie v. Fulton Oil & Gas Co. (Ill.) 86 N. E. 224.

The following are the 3rd and 4th paragraphs of the syllabus in the case of Brennan et al. v. Hunter et al., 68 Oklahoma, 172 Pac. 47:

"3. The lease in question conferred upon the lessees the right to go on its premises and search for oil and gas within the initial period, and to commence operations within that time, and continue same with reasonable diligence until it was determined whether the premises were barren of oil and gas, or either of them were found thereon in paying quantities, and, while the lessees acquired no vested estate in the premises, yet they had the right to the possession of the land to the extent reasonably necessary to perform the obligations imposed upon them by the terms of the lease.

"4. After oil and gas or either of them was found upon the leased premises in paying quantities, the lessees thereby acquired a vested, though limited, estate in the leased premises for the purposes named in the lease, and are entitled to be protected in the exercise of their rights according to the terms and conditions of their contract, unless the lease has been forfeited for a violation of some of its terms or has been abandoned by them."

The following is found in case of Brewster v. Lanyon Zinc Co., 140 Fed. 807-8, opinion by Van Devanter, Circuit Judge:

"The position is taken in the bill that by reason of the clause which declares: 'Second party (the lessees) may at any time remove all his property and reconvey the premises hereby granted, and thereupon this instrument shall be null and void'—the lease was wanting in mutuality, was determinable at the will of the lessee, and was therefore equally determinable at the will of the lessor. The position is not sound. Although the parties, with the sanction of a general practice, denominated the instrument a 'lease,' strictly speaking it was not such, but was more in the nature of a grant in praesenti of all the oil and gas in the lands described—these minerals being part of the realty—with the right to enter and search for them, and to mine and remove them when found. Lanyon Zinc Co. v. Freeman (Kan.) 75 Pac. 995; Dickey v. Coffeyville Vitrified Brick & Tile Co. (Kan.) 76 Pac. 398. Because, however, of the designation given to the instrument by the parties, it is here spoken of and treated as a lease. It runs to the lessee, its successors, and assigns, is without limitation as to time, and plainly shows that it is designed to be perpetual if the oil or gas shall continue, and the lessee and those claiming under it shall fulfill its stipulations. True, it was made and accepted upon certain conditions, one of which is that the premises may be reconveyed at any time at the option of the lessee; but that does not make the estate which it creates a mere tenancy at will within the operation of the common law rule that an estate at the will of one party is equally at the will of the other. That rule is without

application to a lease for a defined and permissible term, but which reserves to the lessee an option to terminate it before the expiration of the term. Archbold's Landlord and Tenant, 92; Dann v. Spurrier, 3 Bos. & Pul. 399; Doe v. Dixon, 9 East, 15. The present lease is of this type. It is essentially one in perpetuity. Such term is permissible in the state of Kansas, where the creation of leaseholds in real property is almost entirely a matter of contract between the parties. Dickey v. Coffeyville Vitrified Brick & Tile Co., supra; Effinger v. Lewis, 32 Pa. 367. The option reserved to the lessee was not designed to convert the estate, as otherwise defined, into a mere tenancy at will, or to make it determinable at any time at the option of the lessor. The lease expresses the intention of the parties, and, no rule of law forbidding, the intention is controlling. The consideration of $1, the receipt of which was acknowledged, although small, was yet sufficient to make the lease effective and to support every stipulation in it favorable to the lessee including the option to surrender it at any time. Brown v. Fowler, 65 Ohio St. 507, 525, 63 N. E. 76; Gas Co. v. Eckert, 70 Ohio St. 127, 135. 71 N. E. 281; Davis v. Wells, 104 U. S. 159, 168, 26 L. Ed. 686; Allegheny Oil Co. v. Snyder, 45 C. C. A. 604, 608, 106 Fed. 764, 767. Resting, therefore, upon an executed and valuable consideration, the lease was not wanting in mutuality merely because it reserved to one party an option which it withheld from the other. Brown v. Fowler and Gas Co. v. Eckert, supra; 9 Cyc. 334."

The lease provides that the plaintiffs in error could extend this lease without completing a well on the premises, by paying, at the end of the first year, $1 per acre per annum, payable annually in advance until such well was completed. This provision has to be read in connection with the first part of the preceding clause, which reads as follows:

"To have and to hold the same unto the said party of the second part his heirs, successors, and assigns, for the term of five (5) years from the date hereof, and as much longer as oil or gas is found in paying quantities."

The effect of these two provisions was to grant to the lessees certain fixed rights which were enforceable at law, and under this covenant the lessors were denied the right to interfere therewith, and any substantial interference by them would be a breach of the contract. The lessees had at least the power under said lease to keep said lease in force for five (5) years by two methods. One was to complete a well within one year, or if they failed to do this, then to pay rents at the rate of $1 per annum in advance for five (5) years, and at the end of that time if they were producing oil in paying quantities then the lease would continue in force as long as they continued to develop and produce oil in paying quantities.

The lessees had, at least, these fixed and indefeasible rights, which could not be denied them by the lessors except at the cost of suffering the legal consequences for the breach. To repeat, the lessees were entitled to the uninterrupted contractual privilege of carrying out and executing the terms of said contract and without let or hindrance from the lessors. The facts in this record show that no well was completed on the said premises the first year; and show a tender and payment in the bank to the credit of the lessors of the stipulated rents for second year. We have already held that that is sufficient compliance as to the payments of the rents as far as the second year is concerned.

We no not know, and the record does not show, that there have been tenders of the rents in advance for the other years that have expired since the suit was begun, nor that the same have been deposited in the depository bank provided for in the lease. By authority of Gillispie et al. v. Fulton Oil Co. (Ill.) 86 N. E. 220, we do not think that the defendants, under the facts and circumstances in this case, are required to make tender. It must be borne in mind that the defendants in error filed suit on the 14th day of March, 1917, which was a notice to these lessees that the lessors were contending that this lease was void and that their contentions in said suit would be inconsistent with the acceptance of the rents. They could not accept the rents without waiving the grounds of their suit and the filing and continuance of the suit waived necessity of tender of the rents. If the defendants in error had dismissed their suit, and had notifiedthe plaintiffs in error that they would accept from them a resumption of the contract, then the lessees would be under the necessity of paying up the rents and be required to comply with the contract, and any failure to comply would be at the risk of forfeiture of the contract. We will state that under this contract the defendants in error, by receipt of rents for the last year, probably would defer operations beyond that time, and by accepting rents for the sixth year, while that probably would not have the effect of starting a new term of five years, it would put the lessors in a position where they would have to serve notice upon the lessees that they would except production the next year and would refuse to receive further rentals; and after which

notice and within what the court would call a reasonable time after the paid period (we will venture to suggest, but not so deciding) in which to begin production or forfeit their lease. In this connection see section 153, p. 246. The Law of Oil and Gas (3d Ed.,) vol. 1, by Thornton. See, also, American Window Glass Co. v. Indiana Natural Gas & Oil Co. (Ind.) 76 N. E. 106; Ind. Nat. Gas & Oil Co. v. Beales (Ind.) 76 N. E. 520, and cases cited therein.

The following is from American Window Glass Co. v. Ind. Nat. Gas & Oil Co. (Ind.) 76 N. E., pages 1007-8:

"It will be noticed that the leases under which appellee is claiming gave to it certain expressed rights 'for a term of 12 years and so long thereafter as petroleum, gas or mineral substances can be produced in paying quantities, or the payments hereinafter provided for are made according to the terms and conditions attaching hereto.' This language is said to be ambiguous and uncertain as to meaning. This is true, but the ambiguity is caused by the use of the word 'or' instead of 'and', thereby subjoining the stipulation, 'the payments hereinafter', etc., as an alternative. This was not the intention of the parties. It would be unreasonable to suppose that in one breath they would be so careful in fixing the time when the leases were to expire and in the next undo it all by stipulating for a nominal annual payment to run indefinitely. The 12-year clause was incorporated into the leases for a purpose, and it is the duty of the court to so construe the contracts as to give them effect, if it can be done consistent with the rules of law, to the end that the intention and purpose of the parties may be effectuated. To our minds the language of the leases last above quoted evidences an intention on the part of the lessor to grant to lessee the exclusive right for the term of 12 years to operate upon said land for petroleum, gas, etc., or the right to delay such operation for such term by paying a certain stipulated annual sum as compensation for such delay; but, in case lessee should in the meantime explore such land and procure the granted product in paying quantities, while this condition existed the lease would continue, although it may go beyond the limit of the 12-year period. The evident intention of the landowner was to have his land developed, and the lessee by the 12-year stipulation in the leases is given an agreed fixed time within which to develop the land and provide a way of utilizing the mineral substances thus obtained. Therefore, in our opinion, had the land owners, at the end of the 12-year term notified appellee that they would not receive any further payments and refused to accept the same, and before payment to the bank gave it notice not to receive any payments for their use and benefit on account of these leases, the rights of appellee under the leases would have terminated. American Window Glass Co. v. Williams, 30 Ind. App. 685, 66 N. E. 912; Indiana Natural Gas & Oil Co. v. Grainger, 33 Ind. App. 559, 70 N. E. 395; Western Penn. Gas Co. v. George, 161 Pa. 47, 28 Atl. 1004; Cassell v. Crothers, 193 Pa. 359, 44 Atl. 446; Murdock-West Co. v. Logan, 69 Ohio St. 514, 69 N. E. 984; Brown v. Fowler, 65 Ohio St. 507, 63 N. E. 76; Northwestern, etc., Co. v. City of Tiffin, 59 Ohio St. 420, 54 N. E. 77; Bettman v. Harness, 42 W. Va. 433, 26 S. E. 271, 36 L. R. A. 566. The facts here show that the property owners accepted from appellee the thirteenth advance annual payment, in the same amount and for the same purpose as theretofore paid by appellee under its leases; that they acknowledged such payment by executing a receipt therefor, which receipt includes the statement, 'which payment continues said lease in force for another term'. In our opinion this transaction alone would not be sufficient to extend such leases for an additional term of 12 years, but it is sufficient to constitute a waiver by the landowners of the definite time of termination therein fixed. It was, therefore, a waiver of their right to claim a forfeiture of the leases at the end of the 12-year period, and effective to require notice to the lessee and a reasonable time thereafter to comply with the terms of the lease before forfeiture.

"There is no claim of fraud or bad faith anywhere in this deal, whereby the land-owners were overreached or induced to grant such waiver. It must be presumed that they accepted the thirteenth payment with full knowledge of all the facts, as well as its legal effect. They were at liberty to insist upon a termination of the leases according to their terms or to waive such stipulations. For a valuable consideration they choose the latter. By their own voluntary choosing they must be content. Therefore to give the transaction the force we have ascribed to it does not take away from the landowners the right to declare a forfeiture of such leases; but before they would be entitled to such forfeiture, under the decisions of our Supreme Court applicable to this special class of contracts, they must give appellee a reasonable time in which to develop the lands after notice of such intention. Consumers', etc., Co. v Littler, 162 Ind. 320, 70 N. E. 363; Consumers,' etc., Co. v. Worth, 163 Ind. 141, 71 N. E. 489; Consumers,' etc., Co. v. Ink, 163 Ind. 174, 71 N. E. 477; Lafayette Gas Co. v. Kelsay, 164 Ind. 563, 74 N. E. 7; Indiana, etc., Co. v. Beales (Ind. Sup.) 76 N. E. 520."

Our purpose in this discussion is to show the nature of this five-year term of limitation. The covenant whereby the lessors granted and demised to the lessees, for them to have and to hold for the term of five years or as long thereafter as oil was produced in paying quantities, would not have the le-

gal effect of fixing a time when this contract should become null and void and end ipso facto, and which could only be renewed and extended by a contract of equal force and dignity with the original lease; but its only effect was to fix a time when the lessors could end the payment of rents and force production or a forfeiture of the lease. These were options and privileges granted the lessors which they could waive, either by receiving the rents or any other acquiescence or waiver either verbal or in writing; and bear in mind all done during the term of the lease.

The case of Pyle et al. v. Henderson et al. (W. Va.) 63 S. E. 762, is a case where there is a strong analogy between the facts, and is absolutely in point in the matter of principles of equity elucidated, applied, and put in force. In the cited case the lessor leased to the lessees lands for oil production. The lease provided that a well must be completed within three months from the date of the contract, or in lieu thereof the lessees agreed to pay the lessor $15 for each three months delay, payable in advance until such well was completed. No well was put down and the commutation money was not paid. The lease was for five years, or as long thereafter as oil was found in paying quantities. The date of the lease was February 13, 1897, and on May 5, 1897, the lessor made another lease to C. E. Pyle, one of the plaintiffs in error in the case. Shortly after the lease was taken the lessees found the title defective, as other parties owned some interest in the land. At the time they took the lease, they knew nothing of this defective title. The lessees in the first lease went to their lessor, who at the time of the giving the lease knew the title was defective, but did not notify the lessees, and demanded a perfecting of the title. He agreed to do so. and agreed for them to advance the money for the expense of perfecting title and the expenditure to be applied upon the payments. The lessor procured one of the outstanding interests, but not the others. The parties who took the second lease had knowledge of the prior lease. The lessor further agreed, during the course of the trouble over the effort to perfect the title that there should be an extension of time. It appears from the record also that at the time of taking of the lease a certain amount of bonus was paid to the lessor by the lessees. The lessees in the first lease did not enter upon the lease and made no offer to do so and made no development during the life term of their lease. The second lessees did enter upon the lands and developed oil. It was held in the suit that an equity had

arisen in favor of the first lessees, under the implied warranty of title, and by reason of the defective title and by reason of the giving of the second lease during the life of the lease, and by reason of the specific and implied promises of the lessor for extension of time made during the lifetime of the lease, and had the effect of tolling the life of the lease beyond the term named in the lease. The court held in favor of the first lessees, entered a decree canceling the second lease, and ordered an accounting for the production. They held in this case that the lessees in the first lease had a warranty for quiet enjoyment implied in an oil lease, in support thereof citing Headley v. Hoopengarner, 60 W. Va. 626, 55 S. E. 744. The legal contentions of the parties under the two conflicting leases are set out in the opinion as follows, to wit:

"The lessees under the first lease neither drilled a well within three months, nor paid the money in place of it stipulated in that lease. For the second lease it is contended that such failure of itself caused the death of that lease; that it would work this result without any act on the part of the lessor declaring a forfeiture, even had the second lease not been made; that Bunfill could have remained quiet, done nothing to manifest an intent to insist upon the death of the lease and it would have come to its end absolutely from such failure alone; that the 'paper is self-destructive.' It is said the document contains no words calling for an act declaring a forfeiture to end it. The contention for the first lease is that an oil lease implies a warranty of good title, and as Bunfill did not have the Sindledecker ninth, the title was not good, and work of development could not be safely done, and he could not insist on a forfeiture. Counsel for the second lease say that there is no place for forfeiture, as the first lease was at an end. So much is this so that the end of the lease, its death from want of compliance with its terms, could not be waived, and that the second lease could have no effect as a declaration or act of forfeiture. That the land had been already freed from the first lease, without the second lease. That nothing but a new lease to the first lessees would do. Those claiming under the first lease say that, as Bunfill's title was defective, and as he agreed to an extension of time for boring a well or paying money in its place, as below stated, he could not enforce a forfeiture; that Bunfill was in no condition to enforce a forfeiture. The other side says that it cannot be held that Bunfill was in no condition to declare a forfeiture, as there was no forfeiture to be declared, because the lease was dead. This distinction is quite refined and unpractical. What if the instrument does not in terms provide for a forfeiture and contain the words? What the plain meaning of the clause that

for failure to drill or pay money the lease 'shall become null and void and all rights thereunder shall cease and determine'? The clause was put there for the benefit of the lessor. Another clause. One giving right to the lessee to surrender and be discharged from liability, covered his case. Surely the lessor could waive this clause made for his protection. It cannot be asserted that there is anything in this clause as written preventing Bunfill from dispensing with it. That a forfeiture may be waived by the landlord in favor of a tenant is reasonable and clear from cases cited in Hukill v. Myers, 36 W. Va. 639, 15 S. E. 151; Roberts v. Bettman, 45 W. Va. 143, 30 S. E. 95."

Both the court below and the appellate court held the contentions in favor of the holder of the first lease. We are unable to see why the principles thus enunciated do not apply in the instant case. They held, in the cited case, that the holder of the first lease was not required to take the risks necessary in development because of the defective title. We can ask, with equal force, why should the lessees in the instant case be required to take their risks of production in the face of a suit threatening to forfeit and cancel their lease? The lease in the instant case contains no specific provisions of forfeiture, while the lease in the cited case did have a provision of forfeiture, which they held, however, was nullified by the payment and acceptance of the bonus at the time of the taking of the lease. The cited case bears out our contention, furthermore, that the fixing of a term in a lease does not have the effect of making the lease null at the end of the term, and which term could be extended only by a contract of equal dignity with the original lease, but that during the life of the term the lessor may act in such a way as to waive or estop himself from claiming a forfeiture of the lease at the end of the term, and that equity will not follow the rule of strict legal forfeiture, but will declare against a forfeiture if good conscience and right, under the facts, circumstances, and conduct of the parties of the lease, warrant their so doing.

Equity knows no favorites as between parties—today it may grant relief to a lessee under an oil and gas lease; tomorrow lessor may be asking it for relief from the rigid and specific terms of an oil lease, and if he is entitled thereto under the general rules laid down for the control of equity, why hesitate to give it to him, even though it require a novel application?

The following is from the case of Kansas Natural Gas Co. v. Harris (Kan.) 100 Pac., quoting from pages 73 and 74:

"The facts found by the court indicate that the lessees under the Evans lease violated the provisions thereof to such an extent that the lessors had a right to declare a forfeiture and terminate the lease. The language of the instrument itself, however, does not appear to be such as would work a termination thereof absolutely merely because of a breach of its provisions. In such a case it seems to be the rule that some affirmative action on the part of the lessor is necessary to accomplish a forfeiture. In 24 Cyc. 1359, it is said: 'The occurrence of a ground of forfeiture does not of itself work a forfeiture. A condition subsequent in a lease that upon neglect of the lessee to perform his covenants the lease shall determine and be void does not render the lease absolutely void upon a default of the lessee, but merely voidable at the election of the lessor, so that, if he elects to waive the forfeiture, the lessee is bound as though there had been no breach of condition. So, where the statute declares that the lease is forfeited on the occurrence of certain events, it merely means that it may be forfeited by the lessor on such occurrence." See also, Alexander v. Touhy, 13 Kan. 64. While a lessor may terminate a lease when facts exist which give him that right, the law does not require him to do so. If he prefers to have the lease continue, he may waive the right of forfeiture. The waiver may be in writing or it may be evidenced by conduct which indicates such a purpose. Then Dow and Dow made the written request upon the gas company to lay pipe to and furnish gas at the leased premises, neither party had declared to the other that the lease was at an end, and neither party at that time seemed to regard it as terminated. It was competent then for them to renew it and competent for the lessors to waive all past delinquencies on the part of the lessees, and we think the written request and the compliance therewith had that effect. Whatever the prior conditions may have been, the parties by this act renewed the lease and infused it with its original vigor. Nothing occurred after this waiver of the lessors to impair the vitality of this instrument, and at the time of the trial the rights of the lessees thereunder were the same as when they first began furnishing gas in compliance with its provisions. The district court erred, therefore, in declaring it at an end, and ordering that it be canceled on account of delinquencies which had been waived."

As to whether the acceptance by the lessors of the rentals for the fifth year at the beginning of the fifth year would or would not raise such a condition as to place the duty upon the lessors to serve notice upon the lessees that they would not receive further rents after the expiration of the term and that they would expect immediate operations for production and whether upon the service of said notice the lessees would then have a reasonable time after the expiration of the term, they having paid the

rents of the last year, that is a question we do not find to be decided directly, but it is our opinion that such acceptance would have such effect. We find it decided, however, that the fixing of the term in the lease does not have the effect of making the relations of the lessors and the lessees such that the lessors cannot waive the requirement that the lessees have paying production at the end of the term; since it has been held that the acceptance of the rentals for the sixth year would constitute a waiver by the lessors, and while it probably would not have the effect of extending the lease for another five-year term, it at least would extend it for another year and, as the authorities herein cited hold, would require notice and demand of performance by the lessors upon the lessees; and under the authorities cited, if the lessors, within the period that such notice of performance was required, should declare a forfeiture of the lease and commence suit, this would have the effect of relieving the lessees of performance during the pendency of the suit.

There are cases wherein contracts have been interpreted, and which contracts provide that a well be completed within a certain time or that rents be paid either quarterly or yearly, and no term was fixed in such contracts as is provided in the one in the instant case, and the courts have held that after the lessors have accepted one of those payments under such contracts and then served notice on lessees that they would not receive further rents and that they would expect the lessees to carry out their contract for the production of oil, then if the lessees fail, within a reasonable time, to begin such production, that would constitute a forfeiture; but if the lessors served notice on the lessees that they would not receive further rents and declared the lease forfeited and began suit of forfeiture, that had the effect of deferring necessity of performance until the assertion of forfeiture was withdrawn and within a reasonable time thereafter.

We cannot see that the fixing of a term in a contract can be of any greater force and gives the lessor any greater right than the one that arises by operation of law, in the leases just discussed. We are unable to see why the commencement of a lawsuit within the term and its prosecution continued as in the instant case beyond the term would not have the effect of raising an equity in favor of the lessees that would at least give them a reasonable time to perform their contract after the ending of said litigation. The fact is, the cited cases hold that even a notification of intention to forfeit, without the bringing of a suit, during the period re-

quiring notice, is sufficient to prevent forfeiture.

It may be suggested that, by the holding in this case, we are setting a precedent that may hereafter be invoked in cases where this court would not be disposed to make an application of it. We find, however, that in the application of equitable principles, courts, while seeking to make a uniform and consistent application of the principles of equity, always reserve the right to judge the equities that arise from the facts of each particular case, and hence we admit that courts should, at all times, be careful in extending equitable application to new and novel situations. When, however, the cou . is convinced that equity, good conscience, and right require such application, it should not hesitate to make the application. We are dealing with a subject-matter, when interpreting oil and gas leases, that is recognized as peculiar and different in its very nature from the usual transactions in human affairs. The denial to a lessee of his right to develop oil production under a contract providing for the same, raises a question of what are his practicable and reasonable remedies. No one can definitely fortell the result of any effort of development. It may result in a total loss of great expenditures of time and money, or it may result in gains both to the lessee and lessor beyond the dreams of avarice. Why, therefore, should courts deny to one who has a valid and subsisting contract, for the delay in the performance of which he, in no sense, is responsible, the right to pursue and carry out the complete purpose of his contract? A breach of most of the ordinary transactions of men probably can be satisfied by an action in damages, but even in those cases where it is shown that such would not be adequate courts of equity will specifically enforce the same if found practicable, and in the instant case we find the remedy quite practicable, and within the power of this or the trial court to grant.

Notwithstanding the great length to which this case has gone, yet we find ourselves unable to resist the temptation to quote the following from Genet v. Delaware & Hudson Canal Co. (N. Y.) 19 L. R. A., page 132:

"I know very well that implied promises are to be cautiously and not hastily raised. What they are was very well stated in Scrantom v. Booth, 29 Barb. 174; in Allamon v. Albany, 43 Barb. 36; and in Booth v. Cleveland Roll. Mills Co., 6 Hun. 597. They always exist where equity and justice require the party to do or to refrain from doing the thing in question; where the covenant

on one side involves some corresponding obligation on the other; where by the relations of the parties and the subject-matter of the contract a duty is owing by one not expressly bound by the contract to the other party in reference to the subject of it. In this court we have thrown some safeguards about the doctrine to secure its prudent application, and have said that a promise can be implied only where we may rightfully asume that it would have been made if attention had been drawn to it (Dermott v. State, 99 N. Y. 101), and that it is to be raised only to enforce a manifest equity, or to reach a result which the unequivocal acts of the parties indicate that they intended to effect (King v. Leighton, 100 N. Y. 386)."

What is the position of the defendants in error in this case at this time, and since filing the motion to dismiss this appeal? They are saying by this motion that they do not want this case tried upon its merits. They in effect. say: "We do not know if our suit, that we filed so long ago, was rightly brought or not, and, what is more, we do not care. The suit that we are responsible for is not over; it still is pending, but the contract is now dead. It has expired by the time limit, and now we ask that this appeal be dismissed, without regard to whether or not our suit was rightfully or wrongfully brought." This is the position the defendants in error are now taking in this lawsuit. The question is, will equity permit them to have what they are now asking for? We say no. That good conscience and right denies them any such relief as this they now are asking for by this motion to dismiss this appeal.

The law says to them that while they. had the legal right, if they saw fit, to file this suit, yet they took on themselves a risk that if it should be found upon this appeal that their suit was not well grounded in law, and that upon appeal that the grounds of forfeiture upon which they ask that this contract be canceled are not well taken, then that they be denied the right now to plead lack of performance of this contract and delay in its performance beyond the time of said contract, which delay can be reasonably attributed to the action of the defendants in error in bringing a suit, which this court now finds was wrongfully brought and not based on equity. In other words, the court says to them: "You are not now in a position to ask equity, because you have not done equity. You are not now in this court with clean hands. You cannot now plead this delay that has, in effect, been caused by your own fault, your own wrong."

The following is from Eastern Oil Co. v. Coulehan (W. Va.) 64 S. E., quoting from page 840:

"But suppose we are wrong in our conclusion on the first question, what rights, if any, did the plaintiff acquire by the slightly belated discovery of gas in the Indian sand? It is conceded the Indian sand was not penetrated and the gas gotten there until about 1 o'clock of August 4th, some 12 hours after the five years had expired. What is the proper construction of the lease as to time? It is for five years from date and as much longer as oil or gas is produced or the rental paid thereon, If oil or gas was produced within the five years given for exploration, the full term thereof was as surely for as much longer as oil or gas should be produced, as it was for the term of five years in which to explore. Failure to produce oil or gas within that time, therefore, while not strictly or technically working a forfeiture of any further right to explore or produce oil or gas, resulted in the same thing to plaintiff, and we perceive no reason why in a proper case equitable principles applicable in cases of technical forfeiture should not be applied. The same necessity therefor, in order to prevent a gross injustice, may arise in the one case as in the other. It is said, however, that in contracts of this kind time is of the essence thereof, and this proposition, for which authorities are cited by counsel is not controverted; but the case we have in hand is one where the plaintiff was legally entitled to the full term of five years given for exploration, without let or hindrances of the lessor. Indeed, the lessee by the implied covenants of his deed was entitled to the protection of the lessor therein. The evidence satisfies us that, though defendant may not have been guilty of serious breach of the implied covenants of his deed, yet that he was anxious the lessee should fail to get to the Indian sand in time, did nothing to aid him, and actually succeeded by his suggestions in preventing work on Sunday, and caused a loss of about 12 hours' time after midnight of August 2nd, when he had no right of interference, but owed a positive duty to plaintiff to protect it in its rights. The drillers, Kenney and Gaffney, give it as their opinion that had they not been thus interrupted the well could have been drilled into the Indian sand and gas produced from it before the time expired."

The following is from Pomeroy's Equity Jurisprudence (Students' Ed.), quoting from pages 182-184:

"On the other hand, the maxim now under consideration, 'He who comes into equity must come with clean hands,' is much more efficient and restrictive in its operation. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence and therefore refuses him all recognition and

relief with reference to the subject-matter or transaction in question. It says that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience, or good faith or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy.

"The principle involved in this maxim is merely the expression of one of the elementary and fundamental conceptions of equity jurisprudence. We have seen that in the origin of the jurisdiction the theory was adopted that a court of equity interposes only to enforce the requirements of conscience and good faith with respect to matters lying outside of, or sometimes perhaps opposed to, the law. The action of the court was, in pursuance of this theory, in a certain sense discretionary; and the terms 'discretionary' and 'discretion', are still occasionally used by modern equity judges while speaking of their jurisdictional and remedial functions. Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days that while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act upon the conscience of a defendant and force him to do right and justice, it would never thus interfere on behalf of a plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who ocupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies. This fundamental principle is expressed in the maxim. 'He who comes into a court of equity must come with clean hands'; and although not the source of any distinctive doctrines, it furnishes a most important and even universal rule affecting the entire administration of equity jurisprudence as a system of remedies and remedial rights.

"Broad as the principle is in its operation it must still be taken with reasonable limitations; it does not apply to every unconscientious act of inequitable conduct on the part of plaintiff. The maxim, considered as a general rule controlling the administration of equitable relief in particular controversies, is confined to misconduct in regard to, or at all events connected with, the mat-

ter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction; it does not extend to any misconduct, however gross, which is unconnected with the matter in litigation, and with which the opposite party has no concern. When a court of equity is appealed to for relief it will not go outside of the subject-matter of the controversy, and make its interference to depend upon the character and conduct of the moving party in no way affecting the equitable right which he asserts against the defendant, or the relief which he demands."

We hold in this case that the lessors, the defendants in error, by instituting and continuing the prosecution of the instant case, have raised an equity in favor of the lessees, the plaintiffs in error, whereby the latter are entitled to such extension of the term of this lease on and after final determination of this suit as is reasonable, and as is right and just. In support of this rule, we cite the following authorities: Blodgett et al. v. Lanyon Zinc Co., 120 Fed. 893; Sitman & Burton v. Lindsay (La.) 48 South. 646; Elkhart Car Works Co. et al. v. Ellis et al. (Ind.) 15 N. E. 249; Ind. Nat. Gas & Oil Co. v. Beales (Ind.) 76 N. E. 520; American Window Glass Co. v. Ind. Nat. Gas & Oil Co. (Ind.) 76 N. E. 1006; Zeigler v. Dailey (Ind.) 76 N. E. 819; Dill v. Frazer (Ind.) 79 N. E. 971 (in this last cited case a forfeiture was held allowable on grounds of abandonment, and holding that the contract was nil by reason thereof—herein the facts differ from other cited cases); New American Oil & Mining Co. et al. v. Trayer et al. (Ind.) 76 N. E. 253; Lafayette Gas Co. v. Kelsay (Ind.) 74 N. E. 7; Consumers' Gas & Trust Co. v. Worth (Ind.) 71 N. E. 489; Consumers' Gas & Trust Co. v. Ink (Ind.) 71 N. E. 477; Eastern Oil Co. v. Coulehan et al. (W. Va.) 64 S. E. 836; Weaver Mining Co. v. Guthrie et al. (Mo.) 175 S. W. 118; Sanders v. Busch-Everett (La.) 71 South. 153; Leonard v. Busch-Everett (La.) 72 South. 749; Stahl v. Van Vleck (Ohio) 41 N. E. 35; Consumers' Gas & Trust Co. v. Littler (Ind.) 70 N. E. 363; Bearman v. Dux Oil Co., 64 Okla. 147, 166 Pac. 199.

The following is from the last cited case, quoting from page 152 of 64 Okla., page 203 of 166 Pac.:

" * * * Defendants entered into a supplemental agreement with intervener, that the time during which he should be kept out of possession and prevented from developing the premises under his lease by the plaintiff should be deducted from the period within which under the terms of his lease he would have to develop. This would be

so in the absence of such an agreement. (Downey v. Gooch 240 Fed. 527; Stahl v. Van Vleck, 53 Ohio St. 135, 41 N. E. 35.)"

The following are quotations from cases heretofore cited:

Fourth paragraph of syllabus of case of Stahl v. Van Vleck, supra:

"It being agreed that such lease should 'continue and be in force for five years from the date thereof', and the second party, having commenced operations in good faith to drill for oil in ample time to complete a well within said term of five years, was wrongfully enjoined by the lessor, and the injunction kept alive until after the expiration of the term of five years, held, that the second party is entitled at the close of the litigation to as much time in which to perform his contract as still remained of his term when he was first enjoined."

Second paragraph of syllabus, Leonard v. Busch-Everett Co., supra:

"A lessor who refused to receive quarterly payments under such a grant and brought suit to annul the lease on the ground that it was a nudum pactum, put himself in default, and cannot be heard to urge that the lessee had not, pendente lite, performed his part of the contract."

Portion of case of Weaver Mining Co. v. Guthrie, supra:

"The doctrine we apply in this case is much the same in principle as that applied by the trial court in the injunction suit of this defendant against this plaintiff, from which this plaintiff appealed, to wit, that one person cannot take advantage of the failure of another to do some act required of him when the complaining party has materially hindered or obstructed him in so doing. He cannot profit by his own wrong, or what may turn out to be his own wrong. It is a species of estoppel, in that the complaining party has induced or compelled the other to do or refrain from doing what he otherwise would or could have done. The appealing of the former suit is merely the means employed by this plaintiff in obstructing and preventing defendant from complying with the terms of her lease. We do not say that every appeal in similar cases would have such obstructing effect as to prevent a forfeiture for a subsequent breach. We so hold under the facts of this case, and affirm the judgment."

Portion of case of Eastern Oil Co. v Coulehan, supra:

"A lessor should not be heard to complain of a default caused by himself, or permitted to take advantage of his own wrong. Delmar Oil Co. v. Bartlett, 62 W. Va. 700, 59 S. E. 634; Cheney v. Libby, 134 U. S. 68, 10 Sup. Ct. 498, 33 L. Ed. 818; Stahl v. Van Vleck, 53 Ohio St. 136, 41 N. E. 35; Hukill v. Guffey, 37 W. Va. 426, 16 N. E. 544. * * * Now

on the subject of substantial performance of the contract, there can certainly be no question as to the fact that the plaintiff substantially performed its contract. It had discovered gas in one sand, and was about to find it in a lower sand in still greater quantities, and we cannot say from the evidence that, but for the improper interference by the defendant with its operation, it would not have discovered the gas in the lower sand, within the term of five years. Where there has been such substantial performance of a contract, equity may set aside or disregard a forfeiture occasioned by a failure to comply with the very letter of an agreement. 1 Pomeroy, sec. 451, p. 756, citing Hagar v. Buck, 44 Vt. 285, 5 Am. Rep. 368, and Bliley v. Wheeler, 5 Colo. App. 287, 38 Pac. 603. And this court in Railroad Co. v. Triadelphia, page 517 of 58 W. Va., page 511 of 52 S. E., recognizes the doctrine announced in Henry v. Tupper, 29 Vt. 358, opinion by Chief Justice Redfield, that relief may be granted in equity even where the condition is for the performance of collateral acts."

Syllabus of Consumers' Gas & Trust Co. v. Ink, supra:

"Where, under a lease of oil lands, the owner had an option to require the lessee to drill for gas or oil within a reasonable time and claiming a forfeiture, or to accept a certain sum annually for delay, the acceptance of such sum annually in advance for several years precluded the lessor from claiming the forfeiture before the year in which the last payment made for a postponement of operations had expired.

"Where a lessor of oil lands demanded a forfeiture of the lease for the lessee's failure to drill for oil at a time when she was not entitled to such forfeiture, such demand was ineffectual as a notice to the lessee to start operations, the claim of forfeiture being equivalent to a denial of the lessee's right thereafter to enter the premises for the purpose of conducting such operations."

Same case, portion of opinion:

"It is very clear that appellee was not entitled to a forfeiture before the agreed term of postponement had expired, and a demand of forfeiture at a time when she was not entitled to it was without legal significance. It could not operate as a notice to start the drill, for the claim of forfeiture was equivalent to a denial of appellant's right to proceed under the contract. And appellee, having produced this uncertainty by her own conduct, will be denied a forfeiture for the delay which she probably induced."

Case of Consumers' Gas & Trust Co. v. Worth, supra, last paragraph of syllabus:

"Where a gas lease is for such period as the lessee shall pay the lessor a specified sum annually in advance or until gas shall be found in paying quantities and the lessor refuses to accept the annual payment and declares the lease forfeited, the failure of

the lessee to thereafter commence development proceedings cannot be regarded as a lack of diligence, entitling the lessor to forfeiture."

From body of same opinion:

"As to whether appellant should have commenced operations between March 3, 1902, and the day on which this action was commenced, is, under the circumstances, not a question in the case, for certainly appellee, after notifying the appellant company that the contract was at an end, was not in a position to insist or expect that appellant should expend money in drilling wells and developing the lands under a contract which she had declared forfeited."

The following is from New American Oil & Mining Co. v. Troyer (Ind.) 76 N. E. 253:

"Under a contract of this sort parties must act fairly with each other. The landowner must be given a fair opportunity to compel such timely operations as will preserve the underlying oil and gas, and prevent its being mined through wells on other premises. While, on the other hand, he will not be permitted to take advantage of delays that have been reasonably induced by his own conduct and force a forfeiture for nonperformance. The operator must have a fair chance to perform his contract. Lafayette Gas Co. v. Kelsay, 164 Ind. 563, 74 N. E. 7; Consumers' Gas Co. v. Ink, 163 Ind. 174, 71 N. E. 477; Consumers' Gas Co. v. Worth, 163 Ind. 141, 71 N. E. 489; Consumers' Gas Co. v. Littler, 162 Ind. 320, 70 N. E. 363. He has not had a fair chance in this case. If appellees, when they accepted the advanced payment on March 10th, or at some other reasonable time, had given appellants notice that they must drill a well within that quarter, and that no further extension of time would be granted, then we should have quite a different question. This suit, however, is brought and prosecuted upon the theory that the failure of appellants to drill a well within the paid period put an end to their right to drill one at all. This view is erroneous. The peculiar character of the contract, and the conduct of the parties while acting under it, are such, we have seen, as make an action without notice and reasonable time to perform inequitable and unsustainable."

Portion of case of Lafayette Gas Co. v. Kelsay, supra:

"Appellee apparently construed the lease or contract as awarding him the right to refuse to accept payments of the well rentals, and thereafter to arbitrarily terminate the rights of appellant under said contract, and proceed to quiet his title to the premises in controversy, without allowing appellant a reasonable time to explore or develop after it had been notified of his purpose to decline in the future all payments of well rentals. This is evident from the facts alleged by him in the second paragraph of his complaint, and further by his acts and declarations as shown by the evidence. Such a construction

of the lease we cannot sanction. Had he in June, 1902, when he first decided to terminate the lease, notified or warned appellant that in the future he would decline to accept payments of the stipulated rentals, and had appellant thereafter, under the circumstances, failed to explore the premises within a reasonable time, in order to discover the existence or non-existence of gas or oil thereunder, then, within the rule asserted in Consumers, etc., Co., v. Littler, 162 Ind. 320, 70 N. E. 363, same company v. Crystal, etc., Co. (Ind. Sup.) 70 N. E. 366, and same company v. Worth (Ind. Sup.) 71 N. E. 789, a different question would be presented. By the provisions of the contract the rentals were to be due on the 1st of January and July of each year, and it was stipulated that payment thereof might be made within ten days after maturity, either direct to appellee, or by depositing the same in the Fairmount Bank, at Fairmount, subject to his order. The payment of the July installment of rent appears to have been made within the time prescribed, by appellant depositing the amount thereof in the bank designated, to the credit and order of appellee; hence, it was not material whether the deposit was made in lawful money, or in checks or drafts, as it was accepted by the bank, and the amount thereof placed to the credit of appellee, subject to his order, thereby enabling him to draw the money from the bank when he desired. Yoke v. Shay, 47 W. Va. 40, 34 S. E. 748; Friend v. Mallory, 52 W. Va. 53, 43 S. E. 114."

We quote from Ross v. Sheldon (Ky.) 119 S. W. 228:

"Whether or not these misfortunes would be sufficient to legally excuse the lessees from a performance of the contract we express no opinion, but we think they furnish reasons why they were not as diligent as they should have been, and, in an action to cancel the contract, are entitled to weight. And we can readily understand why the institution of this action seriously interfered with and retarded the progress of the work that the lessees had commenced before the suit was brought. We do not think the lessees should be held accountable for failing or refusing to do anything under the contract after the lessor had brought his suit to have it canceled. The lessees, of course, did not know how this suit would terminate, or whether they would be successful in defeating it or not. So that, if they did any work, expended any money, or lost any time in carrying out the contract, they would do it at the risk of losing the time and money so invested, or with the prospect staring them in the face of having to bring suit to recover the value of the money invested."

The above suit was brought to cancel a lease and for damages. No injunction was procured. The lessees were in possession and had operations going for production, and the court held that the commencement of

a suit justified the lessees in not pursuing development; then, for a still greater reason, why should not a court grant an extension of a term of a lease where lessor, in possession, brings suit to cancel same, against lessees out of possession?

The above cases cover different facts and different forms of leases. In some of them there were injunctions, possibly one or two for specific performance; some of them, injunctions, were brought by the lessees, who were in possession under their leases and in the act of performing same, and injunctions were brought to prevent interference; others were actions for cancellation of the leases, same as in the case at bar, and in some instances injunctions were asked in those cases to prevent interference and to preserve rights. In all of them the question of cancellation of the lease was raised upon grounds of forfeiture.

In the case of Elkhart Car Works Co. v. Ellis, heretofore cited, and found in the 15 N. E., beginning on page 249, it was held in suit to quiet title, the same as in the instant case, that a re-entry by the grantor and ouster before the breach of the contract or before the expiration of the time of performance, will defeat the right of the grantor to insist upon the forfeiture of the estate. Quoting briefly from said case, it states as follows:

"It would be a flagrant violation of right to permit the grantor of an estate, upon a condition subsequent, to defeat the action by wrongfully preventing the performance of the condition, and the law is not subject to the reproach of permitting such a thing to be done."

Quoting further:

"The breach did not occur until the first day of July, 1882, and the re-entry was made on the first day of June, 1882; these dates are averred as material, traversable facts, and we cannot disregard them, but must yield them their just force. This requires us to hold that the re-entry took place before there was any breach of condition, for the breach did not occur until after the first day of July, 1882, and the re-entry was made on the first day of the preceding month. It is indispensably essential, in order to defeat an estate upon condition subsequent, that there shall be a re-entry, or its equivalent, and there cannot be a re-entry until there has been a breach of the condition. An entry before that time is wrongful, and no rights can result from a wrong. An estate upon a condition subsequent does not fail until there has been a breach of the condition and a demand or re-entry. Both these things must concur to revest the title in the grantor. * * * As is well known, conditions subsequent are not favored, and he who undertakes to forfeit an estate

held upon such a condition cannot successfully ask that intendments shall be made in his favor."

This suit from which the above quotations are taken was based upon a claim of forfeiture and a deed which provided the following conditions: "That if the grantees, or its grantees or assigns, shall at any time within three years from this date, fail, neglect, or refuse to use said real estate in the manufacture of cars for a term of six consecutive months at a time, said real estate shall revert to said grantors".

The same principles laid down and made applicable in the above case are applicable in the instant case. In the cited case, the party bringing the suit made demand and made re-entry on the premises before the time for performance of the conditions subsequent had elapsed. In the instant case, the lessees were out of possession, the lessors were in possession; therefore, re-entry and ouster were not necessary as a preliminary to filing a suit to quiet title, but the wrongful act of the parties was sufficient to defeat the right to maintain the suit upon the grounds of forfeiture, based upon delay in performance, which can be reasonably attributed to the wrongful act of the defendants in error. The authorities that we have heretofore cited hold that the lessees are entitled to free and untrammeled action, without let or hindrance from the lessors, and have a right to demand of the lessors good faith in their relations with them in the execution of the contract.

The lessors are held to be in legal wrong; are held to have infringed the rights of the lessees when they disavowed the contract and began legal action to forfeit the same. In addition to the uncertainty in the developing of oil and the burdens incident thereto, the lessors, by filing suit and thereby adding to the difficulties the added uncertainties of litigation; they thereby, in right and equity, waived their right to ask performance of conditions subsequent from their lessees, and they thereby relieve their lessees by such conduct, from the necessity of performing the condition or proffering performance during the time said litigation is pending.

To be sure, the fixing of a term in the contract gives the lessor the power to stop payment of rentals and force explorations by the lessee to develop and test for production. It must also be borne in mind that the lessor, under the covenants, both specific and implied, of his contract, owes certain duties to the lessee, before he is in a position to demand his pound of flesh, and one of these duties is that he will not act in such a way

as to cast doubt upon the rights of the lessee by filing lawsuits, and persisting in the prosecution thereof, or act in any other manner than in the best of good faith in his relations to said contract and the rights of lessee thereunder, or do that which might amount to an interference with the rights of the lessee to perform, or that which the lessee might from his point of view, reasonably hold to amount to an interference, and which he might deem to affect and destroy his freedom of action in the matter of carrying out the contract according to its strict terms.

For the purpose of getting the reasons for the ruling herein stated another way, we will suppose that, shortly before the suit was filed by the lessors in the instant case, the lessees had decided to begin operations for production and had gotten the material and equipment ready and started to go upon the lands covered by this lease, and they had been met at the boundary by the lessors and notified that they would not be allowed to enter the premises. That the lessors held the lease void, and the lessees concluded that they could not go further without the use of force, and, they being out of possession and the lessors in possession, that it would be futile for them to press their efforts further, and whereupon the lessees ceased their efforts to enter the land and commenced suit for a mandatory injunction or other action amounting to specific performance. To this suit, the lessors answered, we will say, setting up grounds for forfeiture. the same as in the instant case. And the trial court had held, upon such issues, the same as held in the instant case and had denied the lessees the remedy prayed for, whereupon the lessees appealed. Before a decision was rendered in the supposed case by this court, the term of the lease had expired, and this court had held the same as in the instant case, that the appeal was well taken, and that the ground of forfeiture contended for to defeat the remedy asked for by the lessees was groundless, in which event would it not be unreasonable for this court to hold that, because the term had expired, the lessees were not entitled to their remedy?

We cannot grasp the reasoning whereby it can be held that the situation would be any different in the supposed case than it is in the instant case. The only difference that could exist would be the fact that the lessors commenced suit in the instant case; in other words, were the aggressors in the litigation. The commencement of the suit in the instant case was notice to the lessees that their efforts to perform the contract were not wanted by the lessors. It was notice, furthermore, that they intended to press said

litigation to final determination, and that their intention had continued to the present time. We have a right to so conclude, since they have served no notice of intention to withdraw their suit, or ceased demands for forfeiture of the contract. It was notice, furthermore, to the lessees that in the event they went upon the lands and spent their time, labor, skill, and money in an effort to bring production and in the event the suit was decided against them, they would lose what they would expend therein.

The following has been held to be the law in regard to lessees making improvements upon leases that are afterwards forfeited. In the case of Probst v. Bearman, 76 Okla. 71, 183 Pac. 886, they held the following to be the law in such case:

"The cost of improvements and operations incurred by the holder of an oil and gas lease, purchased pendente lite and with actual knowledge of the adverse claim, and of the purpose of such party to insist upon his rights and to obtain redress for the invasion of such rights, will not be deducted, when requiring such holder to account to the successful adverse party for oil and gas produced and sold from the premises."

The law does not require of the lessees in an oil and gas lease, where their lease has been attacked in a suit on grounds of forfeiture, that they assume such risks in order to preserve their rights under the contract. It does not matter what the lessees and their attorneys thought about their rights under the contract and their honest and faithful efforts to comply with the same; they had a right to consider the uncertainties of litigation and discount the possibilities of defeat, and that the courts are not always unerring in their judgments and might hold different from what the lessees and their attorneys might think were their rights. At the risk of a charge of reiteration, we will state that they were not required to take this risk to preserve their rights, but they had a right to contend in the lawsuit and let the litigation take its course, and in the event that they were held right in their appeal, they could justly claim upon high grounds of equity that they be given an efficient remedy in an effort to protect and preserve their rights, which might otherwise be lost to them.

The plaintiffs in error herein have prosecuted their appeal with reasonable diligence, as we view it, and as shown in the record in this case. They filed their motion to advance this cause, and the same was set down for April 16, 1920. They were required to file their briefs on March 9, 1920, and the defendants in error were given 20 days thereafter. The plaintiffs in error filed their

brief February 16, 1920, and on March 2nd the defendants in error filed their brief. On June 15th the defendants in error asked for permission to file a supplemental brief, which was granted to the defendants in error and on July 6, 1920, the defendants in error filed their supplemental brief; so, as we see it, there is no neglect on the part of the plaintiffs in error whereby they have delayed the determination of this lawsuit and caused the decision to be rendered after the life of the lease.

We cannot conceive of many wrongs that modern equity will not relieve against. The breadth and scope of equity powers and the variety and multiplicity of their exercise is well stated by Pomeroy. In the early days of equity jurisprudence, equity acted in personam, and not in rem. But it has broadened its remedies in these later days. See Pomeroy's Equity Jurisprudence (Students' Ed.), pages 208-210:

"This ancient quality in the operation of equitable remedies has been greatly modified by various statutes in the United States, which, in some instances, provide that a decree establishing an estate, interest or right of property in the plaintiff shall execute itself, shall be of itself muniment of title, by divesting the defendant of the interest and vesting the same in the plaintiff, without any conveyance or other instrument of transfer. The decree alone, being on record, operates as a sufficient security of the plaintiff's right as adjudged. In other instances, an officer of the court, commissioner, master, or referee is authorized to carry out the provisions of the decree by executing the necessary instruments, which are thereupon the plaintiff's muniments of title, with the same effect as though they had been executed by the defendant himself.

"When we turn from this mere external manner in which equitable remedies were enforced according to the original chancery procedure to the essential, and so to speak internal, nature and qualities of the remedies themselves, instead of their being merely personal, it is one of the distinctive and central principles of the equity remedial system that it deals with property rights,—estates, interests, liens,—rather than with the mere personal rights and obligations of the litigant parties. This tendency of equity to base its remedies upon the rights of property, in their various grades, from complete estates to liens or charges, is exhibited in the clearest manner in all its suits brought to enforce the rights and duties growing out of contracts. Although the contract is executory, even though it stipulates only with respect to things not yet in existence,—things to be acquired in future,—the remedial right is worked out by conceiving of a present ownership, interest, lien or charge, as arising from the executory provisions, or a present possibility which will ripen into

such an interest, and by establishing this proprietary right, protecting and enforcing it. The decree, with a few exceptional cases, passes over the personal rights of the plaintiff, and the personal obligations of the defendant, deals with rights or interests in property, and shapes its relief by conferring rights, or imposing duties growing out of or connected with some grade of property. Even when the executory contract creates what at law would be a debt, and when the recovery at law would be a general pecuniary judgment, the equitable remedy views this debt as an existing fund and awards its relief in the form of an ownership or of lien upon that fund. A general pecuniary judgment to be recovered from the debtor's assets at large—as an award of damages— is only granted by a court of equity under very exceptional circumstances.

"Another quality of the distinctively equitable remedies, connected with and perhaps growing out of the one last mentioned, is their specific character, both with respect to substance and form. Except in actions to recover possession of land or of chattels ('action of right,' 'ejectment,' or 'replevin'), the legal remedies by actions are all general recoveries of specified sums of money, which may be collected by execution out of any property of the debtor not exempted. The equitable remedies, with a few exceptions, are specific; deal with specific things, land, chattels, choses in action, funds, establish specific rights, estates, interests, liens, and charges in or over these things; and direct specific acts to be done or omitted with respect to these things, for the purpose of enforcing the rights and duties thus declared. Even when the controversy is concerning pecuniary claims and obligations, and the final relief is wholly pecuniary, the equitable remedies are administered by regarding the subject-matter as a specific fund, and by adjudging such fund to its single owner, or by apportioning it among the several claimants. It is the distinctive feature of the system, which gives it a superior efficacy over the legal methods, that it ascertains a rightful claimant's interest in or over a specific thing, land, chattels, choses in action, debts, and even money in the form of a fund, and follows it through the hands of successive possessors as long as it can be identified. The two qualities which I have thus described, that equitable remedies deal with property rights rather than with personal rights and obligations, and that they are specific in their nature, are the peculiar and important features of the system, and give it the power of expansion and of application to an unlimited variety of circumstances, which enables equity to keep abreast with the progress and changing wants of society."

It is, therefore, the view of the writer of this dissenting opinion that an equity has arisen in favor of the plaintiffs in error, by reason of this litigation, and that they are

entitled to a reasonable time on and after the final determination of said litigation to enter upon the lands covered by this lease, for the purpose of exploring and making a test for oil production, if they elect so to do.